IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| Daniel S. Leonard, *et al.*, | * | |
| Plaintiffs, | * | |
| v. | * | Civil Action No.: RDB 09-2134 |
| Exelon Generation Company, LLC, | * | |
| Defendant. | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM OPINION

Plaintiffs Daniel J. Leonard ("Leonard") and his wife Tammy L. Turvin ("Tammy"), individually and as legal guardian and next friend of her minor daughter Megan L. Turvin ("Megan") (collectively, "Plaintiffs"), bring this negligence action against Defendant Exelon Generation Company, LLC ("Exelon"). Plaintiffs have moved for partial summary judgment on their negligence claims. Defendant Exelon has filed a cross-motion for summary judgment, asserting in the alternative that it is immune from liability, not negligent or that Plaintiffs' claims are barred by their own contributory negligence. Jurisdiction is based on diversity of citizenship under 28 U.S.C. §1332. The parties' submissions have been reviewed and no hearing is necessary. *See* Local Rule 105.6 (D. Md. 2009). For the reasons that follow, Plaintiffs' Motion for Partial Summary Judgment (Paper No. 17) is DENIED and Defendant Exelon's Cross-Motion for Summary Judgment (Paper No. 18) is GRANTED.

## BACKGROUND

This Court reviews the facts relating to this claim in the light most favorable to the petitioner. *See, e.g., Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir. 1997). Plaintiffs

1

contend that Exelon negligently operated the Conowingo Dam, causing the Susquehanna River below it to quickly rise and injure Plaintiffs, who were fishing in the river that day.

Defendant Exelon, which generates and sells electricity, is the sole operator of the Conowingo Dam and Hydroelectric Facility (the "Dam"), located in Harford County, Maryland on the Susquehanna River (the "River"). Exelon's property extends six miles from the Dam down the river, on both sides, and includes Rowland Island, the closest island to the Dam. Baldwin Depo. 23-24; Summ. J. Mem. Exs. 2, 3. Exelon operates the Dam under a Federal Energy Regulatory Commission ("FERC") license, which obliges it to open its land to the public for recreational use. Summ. J. Mem. Ex. 1. Among the recreational amenities provided by Exelon is Fishermen's Park, which provides a fishermen's platform, restrooms and parking for the public's use. Baldwin Depo. 23-24; Summ. J. Mem. Ex. 8. Fishermen's Park extends downriver to the end of Rowland Island. Baldwin Depo. 23-24.

Exelon leases the property downriver from Fishermen's Park and Rowland Island to the State of Maryland to be used as Susquehanna State Park. Summ. J. Mem. Ex.4. Under the terms of this lease, the Maryland Recreational Use Statute, Maryland Code Natural Resources §§ 5-1101 - 5-1108 ("MRUS"), generally applies and relieves Exelon of liability for injuries that happen on the leased land. Summ. J. Mem. Ex.4, ¶ 13. As the lease explains:

> The parties intend that the provisions of Sections 5-1101 through 5-1108 of the Natural Resources Article limit [Exelon]'s liability to recreational users of the Leased Premises and will assert these statutory provisions as a defense against any third-party claim against [Exelon], or its successors or assigns, which may arise as a result of [Maryland's] use of the Leased Premises.

*Id*. Section 5-1103 of the MRUS explains the breadth of the liability immunity granted to such landowners: "[A]n owner of land owes no duty of care to keep the premises safe for entry or use by others for any recreational or educational purpose, or to give any warning of a dangerous

2

condition, use, structure or activity on the premises." MRUS § 5-1103. There is no dispute that at the time of the incident Plaintiffs were fishing on this leased land that is downriver of Fishermen's Park.

Each day, Exelon opens a number of its eleven turbine gates in order to generate electricity from the water. Summ. J. Mem. Ex. 5, Appleton Depo. 13. When a turbine is activated, it releases water from the Dam to the tailrace, which is the downstream part of a dam where water that comes through or around a dam re-enters the river. *Id*. 8, 16-19. A computer determines which turbine gates to open and when to open them. *Id*. 13. Before a turbine is activated, however, an Exelon control room operator must push a button on his computer indicating the tailrace check has been completed. *Id*. 22. A complete tailrace check requires a control room operator to survey the tailrace area and Fishermen's Park through nine cameras and determine if there are any boaters or fishermen in those areas. *Id*.; Summ. J. Mem. Ex. 8. Once the control room operator has done so, he must then activate a system of red beacon lights and sirens placed throughout the downriver side of the Dam, including those on Rowland's Island and throughout Fishermen's Park, which sound an alarm for approximately five minutes to alert anyone in the affected areas that the water level is about to rise. Appleton Depo. 16-23. Notably, Exelon has placed myriad large warning signs around the Dam, throughout Fishermen's Park and on Rowland's Island warning fishermen that flashing red lights and sirens indicate that the water level is about to rise and they should seek higher ground. Summ. J. Mem. Ex. 9. Don Baldwin, a senior engineer at Exelon, states that even if a control room operator sees a fisherman in waters that will be affected by activating a turbine during the tailrace check, he will usually activate the turbine because a significant rise in water level does not happen immediately, but

3

over the course of five to ten minutes. Summ. J. Mem. Ex. 2, Baldwin Depo. 64-67. Further, Baldwin explains that not all fishermen feel the need to move since typically the water level starts low and only rises a foot or two. *Id.* 70-71.

On Monday, August 7, 2007, the date of the alleged incident, the sirens on Rowland Island were not working. Baldwin Depo. 55-59; Appleton Depo. 71-72. Exelon's maintenance crew was aware of and troubleshooting the problem that morning, but did not fix it until the next day, Tuesday, August 8, 2006. Baldwin Depo. 57. The red beacon lights, however, were functioning at all times. Appleton Depo. 32-33, 50. During the pertinent time period that day, the Dam's turbines were activated at three different points. Appleton Depo. 32. Doug Appleton, who was the control room operator on August 7 confirms that he followed the normal tailrace check procedures - visually surveying the affected areas and turning on the sirens and lights - before activating each turbine. *Id*. 31. Appleton did not know, however, that the sirens were not functioning because he could not hear them from the control room. *Id*. 34. At deposition, Appleton stated that if he had known the sirens were not working, he would not have activated the turbines until a guard walked up and down the shore warning fishermen with a bull horn, per Exelon's backup safety procedures. *Id*. 35.

On Monday, August 7, 2007, Daniel Leonard, a 37 year old construction worker, his then fiancée Tammy Turvin and her twelve year old daughter, Megan Turvin, arrived at Fishermen's Park at around 9 a.m. Summ. J. Mem. Ex. 11, Leonard Depo. 43-44. Leonard was familiar with the area, having fished on the Susquehanna River twenty to thirty times a year since he was eighteen years old. *Id*. 6, 30. Leonard entered the River approximately 75 yards past the downriver end of Rowland Island and began fishing on a large rock he had previously fished on

4

that was around 50 to 75 feet from shore. *Id*. 49-50, 56. At some point, Leonard helped Tammy and Megan, who did not know how to swim, walk out to the rock he was fishing on; they were able to reach the rock because the water level was very low, rising only up to their shins or ankles. *Id*. 55-57, 65. *Id*.

Shortly after Tammy and Megan reached the rock, however, the Dam's system of flashing lights were turned on, warning that a turbine was about to be activated and that the water level was going to rise. *Id*. 126. Leonard was aware of the Dam's safety procedures, specifically that the flashing lights meant that the water level would start rising in approximately five minutes. *Id*. 34-35. Leonard did not see the lights go on, though, because he had his back to them and was "not paying attention to the lights," but was instead focusing on his fishing. *Id*. 128. Leonard also did not notice when the water initially started to rise, but was alerted to it when Tammy shouted at him that Megan had slipped off the rock they were standing on and into the water. *Id*. 55-56. Upon seeing this, Leonard claims he dove into the shallow water hands-first, "banged into some rocks, grabbed [his] daughter from underneath the water and got her to shore." *Id*. 63-64. He then helped Tammy, who "was still out in the river clinging to a rock," to shore as well. *Id*. Tammy contends the water ultimately rose from ankle-deep to a foot or a foot and a half high in the course of thirty seconds. Summ. J. Mem. Ex. 12, Tammy Turvin Depo. 14. As a result of the incident, Leonard lost his fishing equipment. *Id*. 19.

After Leonard, Tammy and Megan were back on shore, they walked to the guard station to report what had transpired. Leonard Depo. 80. While at the guard station, Leonard provided a written statement saying:

> We were down by Deer Creek. We walked out about fifty feet to some other rocks and all of a sudden the water just rose out of nowhere and the current got

5

really strong. No lights or sirens and we could see the dam clearly. My daughter
Megan went under. Actually, we all did and we lost nine fishing rods and a camp
chair.

*Id*. 86-87. After submitting this report, Leonard learned that the sirens were not working and that Exelon workers had been troubleshooting the sirens that morning. *Id*. 81. None of the Plaintiffs mentioned any injuries during their time at the guard station.

Upon hearing of the incident, Ron Smith, an Exelon employee, was dispatched to purchase replacement fishing equipment for Leonard. *Id*. 92; Summ. J. Mem. Ex. 14, Smith Aff. ¶ 1. Smith called Leonard and asked to meet him and his family at Dick's Sporting Goods to pick out the equipment. Leonard Depo. 92-95. While at the store, Smith observed that Leonard was able to manipulate fishing rods and reels with his hands without any difficulty. Smith Aff. ¶ 6. Plaintiffs did not mention to Smith that they had any physical injuries at that time. *Id*. Doug Appleton also called Leonard after the incident to discuss what had transpired. Appleton Depo. 52. Leonard did not mention that he, Tammy or Megan had any physical injuries during this conversation. *Id*.

On August 13, 2009, Plaintiffs filed the pending complaint on behalf of themselves and Megan in the Circuit Court of Cecil County, Maryland. Defendant subsequently removed this case to this Court based on diversity of citizenship under 28 U.S.C. § 1332. Plaintiffs are residents of Maryland and Exelon has its principal place of business in Pennsylvania.[1]

---

[1] Plaintiffs originally filed their complaint against Defendant Exelon as well as Susquehanna Electric Company ("SECO") and PECO Energy Company ("PECO"). SECO was merged into Exelon as of January 1, 2009. As a result, Exelon became the sole owner and operator of the Dam and succeeded to all legal rights and obligations of SECO. PECO did not own, operate or maintain the Dam on the date of the incident. Accordingly, on September 9, 2009, Plaintiffs and Exelon stipulated to the substitution of Exelon for SECO and to the dismissal of all claims against SECO and PECO. *See* Stipulation of Dismissal, Paper No. 13.

## STANDARD OF REVIEW

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A material fact is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine issue over a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In considering a motion for summary judgment, a judge's function is limited to determining whether sufficient evidence exists on a claimed factual dispute to warrant submission of the matter to a jury for resolution at trial. *Id.* at 249. "A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). In that context, a court is obligated to consider the facts and all reasonable inferences in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *see also E.E.O.C. v. Navy Federal Credit Union*, 424 F.3d 397, 405 (4th Cir. 2005). However, Rule 56 mandates summary judgment against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

When both parties file motions for summary judgment, as here, the court applies the same

standards of review. *Taft Broad. Co. v. United States,* 929 F.2d 240, 248 (6th Cir. 1991); *ITCO Corp. v. Michelin Tire Corp.,* 722 F.2d 42, 45 n.3 (4th Cir. 1983) ("The court is not permitted to resolve genuine issues of material fact on a motion for summary judgment - even where . . . both parties have filed cross motions for summary judgment.") (emphasis omitted). The role of the court is to "rule on each party's motion on an individual and separate basis, determining, in each case, whether a judgment may be entered in accordance with the Rule 56 standard." *Towne Mgmt. Corp. v. Hartford Acc. & Indem. Co.,* 627 F. Supp. 170, 172 (D. Md. 1985). "[B]y the filing of a motion [for summary judgment] a party concedes that no issue of fact exists under the theory he is advancing, but he does not thereby so concede that no issues remain in the event his adversary's theory is adopted." *Nafco Oil & Gas, Inc. v. Appleman,* 380 F.2d 323, 325 (10th Cir. 1967); *see also McKenzie v. Sawyer,* 684 F.2d 62, 68 n.3 (D.C. Cir. 1982) ("[N]either party waives the right to a full trial on the merits by filing its own motion."). However, when cross-motions for summary judgment demonstrate a basic agreement concerning what legal theories and material facts are dispositive, they "may be probative of the non-existence of a factual dispute." *Shook v. United States,* 713 F.2d 662, 665 (11th Cir. 1983) (citation omitted).

ANALYSIS

**I.      Exelon's Immunity under the Maryland Recreational Use Statute**

Exelon contends that it is immune from Plaintiffs' negligence claim because it did not owe them a duty of care under the Maryland Recreational Use Statute ("MRUS"). The purpose of the MRUS is to encourage landowners to make their property available to the public for recreational or educational purposes by limiting a landowner's liability. MRUS § 5-1102(a). The MRUS therefore explicitly extends immunity to a landowner who leases his land to the state.

MRUS § 5-1105. MRUS explains the breadth of liability immunity granted to such landowners in § 5-1103: "[A]n owner of land owes no duty of care to keep the premises safe for entry or use by others for any recreational or educational purpose, or to give any warning of a dangerous condition, use, structure or activity on the premises." MRUS § 5-1103. Even when a landowner "invites" the use of his property for recreational purposes, as long as he does so without charge, his actions are not measured by traditional premises liability standards. As the statute explains:

> An owner of land who either directly or indirectly invites or permits without charge persons to use the property for any recreational or educational purpose . . . does not by this action:
>
> (1) Extend any assurance that the premises are safe for any purpose;
>
> (2) Confer upon the person the legal status of an invitee or licensee to whom a duty of care is owed; or
>
> (3) Assume responsibility for or incur liability as a result of any injury to the person . . . caused by an act or omission of the person.

MRUS § 5-1104. The statute does not, however, provide liability immunity to landowners in two limited circumstances: (1) when a fee is charged, or (2) when a landowner willfully or maliciously fails to guard or warn against a "dangerous condition, use, structure, or activity." MRUS § 5-1106. The MRUS has only been considered and applied in one Maryland case, *Fagerhus v. Host Marriott Corp.*, 143 Md. App. 525 (2002). In that case, the plaintiff injured his shoulder when he fell on black ice while trail running and sued the property owner of the portion of the trail where he fell, as well as the manager of the hotel where he was staying at the time he was injured. The trial court granted summary judgment in favor of defendants, and the Maryland Court of Special Appeals upheld the judgment. That court emphasized that, as clearly explained in MRUS § 5-1102(a), the purpose of the MRUS is to give a landowner "every reasonable

9

encouragement" to permit others to use his property for recreational purposes without charge. *Fagerhus*, 143 Md. App. at 539.

Exelon leases its property downriver from Fishermen's Park to Maryland for use as the Susquehanna State Park. Exelon's lease explicitly states that the MRUS applies to limit Exelon's liability for recreational users of Susquehanna State Park and that the MRUS provides "a defense against any third-party claim against [Exelon], or its successors or assigns, which may arise as a result of [Maryland's] use of the Leased Premises." Summ. J. Mem. Ex. 4 ¶ 13. There is no question that when Plaintiffs were allegedly injured they were in Susquehanna State Park for recreational purposes. Plaintiffs accessed the fishing area by parking at and walking through Fishermen's Park. It is undisputed that Plaintiffs paid no fee to enter or park at Fishermen's Park. Furthermore, Plaintiffs do not make any claim in their complaint that Exelon willfully or maliciously failed to warn against a dangerous condition on the land.[2] Accordingly, the MRUS grants liability immunity to Exelon for Plaintiffs' alleged injuries.

Plaintiffs' sole argument that Exelon is nonetheless liable is premised upon a finding that the MRUS does not apply when an injury is the result of the negligent operation of an improvement on leased land. Specifically, Plaintiffs contend that Exelon's negligence did not arise from its passive ownership of unimproved land, where the MRUS would apply, but instead from actively failing to properly operate the Dam. Plaintiffs' argument is drawn from a ruling by the Pennsylvania Supreme Court, *Stone v. York Haven Power Co.*, 561 Pa. 189 (2000), which

---

[2] In their Complaint, Plaintiffs do not contend that Exelon's actions rise to the level of willful or malicious conduct. In Plaintiffs' opposition brief, however, they state for the first time that Exelon's conduct "even rise[s] to a willful failure to warn against the dangerous condition." Pls.' Opp. 4. Since Plaintiffs have not supported this new theory with any allegation that Exelon's alleged negligence was intentional, deliberate or purposeful, this Court finds Plaintiffs' claim to be meritless.

recognizes a distinction between injuries arising from improvements on land, such as a dam, and injuries arising from unimproved or "raw" land. In *Stone*, plaintiffs' decedents were killed in a boating accident plaintiffs alleged was caused by York Haven's failure to warn of the dangers of its dam, which created a lake that York Haven opened to the public for recreational use without charge. York Haven claimed immunity pursuant to the Pennsylvania Recreational Use of Land and Water Act, 68 Pa. Cons. Stat. § 477-1 *et seq*. The Pennsylvania Supreme Court held that since the dam was an improvement on the land it was not subject to the immunity protections under the Pennsylvania recreational use statute. *Stone*, 561 Pa. at 196-97. The court then distinguished between the dam and the lake, explaining that though the lake was man-made, the dangers it presented were comparable to those of a natural lake; thus the lake was entitled to statutory immunity. *Id*. The court concluded that "a lawsuit based upon injuries arising from perils that are inherent in the use of the lake for recreational purposes can proceed only if the plaintiff can show that the owner engaged in a 'willful or malicious failure to guard against a dangerous condition or activity.'" *Id*.

As an initial matter, *Stone* is not applicable to this case since it arose under Pennsylvania law. The MRUS explicitly states that it applies to land, which includes "water, water courses, private ways *and building, structures and machinery or equipment when attached to realty*." MRUS § 5-1101(d) (emphasis added). Thus, the MRUS clearly explains that it applies even to "improvements" on the land, such as the Dam. The only Maryland case applying the MRUS, *Fagerhus*, applied the statute to improvements on land - an asphalt trail - without commentary. Even if *Stone* were applicable, however, it would not preclude Exelon from receiving immunity under the MRUS because Plaintiffs were not allegedly injured by the Dam itself, but instead by

11

the water in the undeveloped river below the Dam.[3] Though the water level was affected by the use of the Dam, the ebb and flow of a river and rising tides are natural occurrences that happen in all rivers at all times, whether a dam is present or not. To paraphrase the Pennsylvania Supreme Court, the dangers the man-made tide presented in this case were comparable to those of a natural tide. Accordingly, Exelon is entitled to statutory immunity for Plaintiffs' alleged injuries resulting from the change in water level.

This Court's analysis is consistent with that of many courts that have addressed similar issues and have held that owners are immunized for liability for injuries resulting from a dam on leased land where the state's recreational use statute applies. *See, e.g., Maldonado v. United States*, 893 F.2d 267, 268 (10th Cir. 1990) (affirming that New Mexico's Recreational Use Statute barred plaintiff's claims for the injuries he sustained when diving into a natural pool that had an unusually low water level due to dam operations); *Jenkins v. Arkansas Power & Light Co.*, 140 F.3d 1161, 1163 (8th Cir. 1998) (affirming that Arkansas' Recreational Use Statute precluded plaintiff's claim against a dam operator where plaintiff was injured after diving into water that was shallow as a result of the dam's operations); *Kantner v. Combustion Engineering*, 701 F. Supp. 943, 949 (D.N.H. 1988) (holding that New Hampshire's Recreational Use Statute bars a claim where plaintiffs' decedents drowned near the base of a dam); *Chrisley v. U.S.*, 620 F. Supp. 285, 293 (D.S.C. 1985) (finding that the South Carolina Recreational Use Statute extended immunity to dam owners for claims of a fisherman who fell into turbulent water released from a dam and drowned); *Clark v. Tennessee Valley Authority*, 606 F. Supp. 130, 131 (N.D. Ala. 1985) (applying Tennessee's Recreational Use Statute to bar a claim by a plaintiff

---

[3] As discussed in Section III, Plaintiffs' injuries are questionable at best.

whose boat fell over a dam spillway); *Brewer v. Dept. of Fish and Wildlife*, 2 P.3d 418, 432 (Or. App. 2000) (holding that Oregon's Recreational Use Statute applied to the dam and the waters below it).

II.     **Exelon's Alleged Negligence**

Even if the Maryland Recreational Use Statute did not provide Exelon immunity from liability, Plaintiffs have not proven that Exelon's alleged negligence caused their alleged injuries. Maryland courts have held that "for a plaintiff to state a *prima facie* claim in negligence, he or she must prove the existence of four elements by alleging facts demonstrating (1) that the defendant was under a duty to protect the plaintiff from injury, (2) that the defendant breached that duty, (3) that the plaintiff suffered actual injury or loss, and (4) that the loss or injury proximately resulted from the defendant's breach of the duty." *Patton v. United States Rugby Football, Union, Ltd.*, 381 Md. 627, 635-36, 851 A.2d 566 (2004) (citing *Remsburg v. Montgomery*, 376 Md. 568, 582, 831 A.2d 18 (2003)) (internal quotations omitted). Plaintiffs do not contend that Exelon's alleged negligence had any effect on how high or how fast the River's water level rose. Plaintiffs only allege that Exelon's failure to warn them by siren was negligent and caused them to stay in the River after the water level became dangerous. Yet, there is no dispute that Exelon posts numerous large signs throughout Fishermen's Park and Rowland Island warning that the water level periodically rises and urging people to wear life jackets. Before it activates a turbine, Exelon sets in motion a comprehensive safety system consisting of visually inspecting the area downriver from the dam for fishermen and using sirens and flashing lights to alert fishermen in the area when the water level is going to rise. Though the sirens were not

13

working on the day of the incident, the myriad warning signs and the flashing lights were sufficient to alert Plaintiffs of the dangers of entering the water and fishing in Fishermen's Park. Accordingly, Plaintiffs have not proven that Exelon's failure to warn them with sirens of the rising tide caused their alleged injuries.

### III. Plaintiffs' Alleged Injuries and Contributory Negligence

Finally, even if the MRUS did not bar Plaintiffs' claims and they were able to prove Exelon's negligence caused their alleged injuries, Plaintiffs still could not succeed in bringing a negligence action because Tammy Turvin and her daughter Megan admitted they were not injured, and Leonard was contributorily negligent for his alleged injuries. Tammy stated at her deposition that her foot was sore for a couple of days after she fell into the river. Tammy Turvin Depo. 20. When she was asked if she had any physical injuries after the incident, however, she replied that she had a headache the following day, but otherwise had no physical injuries. *Id*. 23-24. At Megan's deposition, the twelve year old said she had no injuries as a result of falling into the river, and complained only of feeling "cold and wet" after she got out of the water. Megan Turvin Depo. 19. Thus, since both Tammy and Megan admitted that they were not injured as a result of the incident, neither could succeed on a cause of action for negligence against Exelon.

Only Leonard claims he was injured, contending that he suffered nerve damage in his hands as a result of diving hands-first into the shallow water and hitting the rocks. Leonard Depo. 107-110. Under Maryland law, contributory negligence is a complete bar to recovery in negligence actions. *See Hooper v. Mougin*, 263 Md. 630 (Md. 1971); *Leakas v. Columbia Country Club*, 831 F. Supp. 1231, 1236 (D. Md. 1993). There is no dispute that Leonard ignored the signs warning recreational users of Fishermen's Park to wear life preservers, and did not

14

require his twelve year old daughter - who did not know how to swim - to wear a life preserver. Nonetheless, Leonard, who was well aware of the Dam's potential dangers, brought Megan and Tammy to a low rock in the middle of the River. Leonard and Tammy, who also knew about the dangers of the Dam, then paid no attention to the flashing lights that would have indicated to them that the water level was going to rise and given them sufficient time to get back to shore. Finally, Leonard dove hands-first into shallow water that he knew was full of rocks. Thus, Leonard was contributorily negligent for his injuries. *See also Leakas v. Columbia Country Club*, 831 F. Supp. 1231, 1237 (D. Md. 1993) (plaintiff swimmer was contributorily negligent where he dived into the shallow end of a pool without checking the depth of the pool); *Campbell v. Baltimore Gas & Electric Co.*, 95 Md. App. 86, 95-96 (Md. 1993) (holding plaintiff was contributorily negligent when he extended a ladder onto an electric wire without first inspecting the area). Thus, under Maryland law, Leonard's contributory negligence prohibits him from recovering from Exelon. Accordingly, since Tammy Turvin and Megan Turvin admitted they did not suffer any injury, and Leonard's negligent conduct significantly contributed to his alleged injuries, Plaintiffs are barred from recovering against Exelon under a theory of negligence.

## CONCLUSION

For the reasons stated above, Plaintiffs' Motion for Partial Summary Judgment (Paper No. 17) is DENIED and Defendant Exelon's Cross-Motion for Summary Judgment (Paper No. 18) is GRANTED.

A separate Order follows.

Dated: July 13, 2010                        /s/_____
                                            Richard D. Bennett
                                            United States District Judge

15